IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STEVEN H. ROCK                  :

                           :

    v.                     :        Civil Action No. DKC 10-0829

                           :

SECRETARY JOHN MCHUGH           :

                           :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this disability discrimination action is a motion to dismiss, or alternatively, for summary judgment filed by Defendant John McHugh.[1] (ECF No. 8). Also pending is a motion to seal filed by Plaintiff Steven H. Rock (ECF No. 15), and a motion to seal filed by Defendant (ECF No. 20). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendant's motion for summary judgment will be granted, but the motions to seal will be granted in part and denied in part.

**I.  Background**

This case arises from the termination of Plaintiff, Steven H. Rock, from the Division of Plans, Training, Mobilization, and

---

[1] Pete Geren was named as the original defendant in this case, but he was succeeded as Secretary of the Army by John McHugh on September 21, 2009. Accordingly John McHugh is the now the named Defendant.

Security at the United States Army Research Laboratory ("ARL") in Adelphi, Maryland. From 1989 to 2006, Plaintiff worked as an industrial hygienist at ARL, where he managed the occupational health program. (ECF No. 14-40, Ex. 36, at 1). In addition to investigating potential occupational health and industrial hygiene hazards, Plaintiff inspected and evaluated ARL laboratories and the Blossom Point Research Facility ("BPRF") to ensure that employees handled toxic and hazardous chemicals safely. (ECF No. 8-1, at 5). Plaintiff believes that he was a good employee who was terminated because he suffered from alcoholism. (ECF No. 14, at 3). Defendant, however, maintains that Plaintiff was discharged for his unsatisfactory performance, frequent unscheduled and unauthorized leave since 2001, and lack of cooperation. (ECF No. 8-1, at 5).

During his tenure at ARL, Plaintiff worked under the management of several supervisors, the first of whom was Cynthia L. Tootle. In June 2001, Tootle required Plaintiff to follow a special leave procedure[2] because his "frequent and unscheduled

_____

[2] The special leave procedure required Plaintiff to obtain prior approval before taking sick leave for prearranged medical appointments. In the event of an unexpected and incapacitating illness or injury, he was required to contact Tootle personally to request sick leave. Upon his return to work, he was required to provide written documentation from an "attending physician or licensed medical practitioner." (ECF No. 8-5 ¶ 3a).

use of sick leave is unacceptable" and "has hampered and continues to hamper" the performance and efficiency of his office. (ECF No. 8-5 ¶¶ 2-3). Tootle cautioned that failure to follow these procedures "may serve as a basis for disciplinary action." (*Id.* ¶ 3c). In addition, she advised Plaintiff that "[i]f some personal situation or problem is contributing to your frequent unscheduled absences from work, the Wellness Center is available to assist you." (*Id.* ¶ 4).

Tootle rated Plaintiff's performance from October 1, 2000, to September 1, 2001, as "unsatisfactory,"[3] indicating that his work was inadequate and untimely, and that he had strained working relationships with other ARL employees.[4] (ECF No. 8-6). Furthermore, Plaintiff "did not take responsibility" and required more supervision "than would be expected of someone of his position." (*Id.*) Tootle also placed Plaintiff under an informal performance improvement plan ("PIP"), but Plaintiff still failed to meet deadlines. (*Id.*)

---

[3] The "unsatisfactory" category ranges from zero to forty-nine points. Plaintiff earned forty-eight points. (ECF No. 8-10).

[4] Specifically, Tootle wrote, Plaintiff "did not meet all his performance objectives," "was not effective in his working relationships [and] has set up an adversarial relationship" with ARL laboratory employees. (ECF No. 8-6).

Plaintiff's next supervisor, Robert E. Chase, placed him on formal PIP on March 21, 2002. (*See* ECF No. 8-7). Chase found Plaintiff's performance "unacceptable"[5] and gave him 120 days to improve. (*Id.* ¶ 2). In addition, he counseled Plaintiff to seek help at the ARL Wellness Center if his poor performance was caused by personal or health problems. (*Id.* ¶ 8). Subsequently, Plaintiff's performance improved and he successfully completed PIP on August 22, 2002. (ECF No. 8-8; ECF No. 14-12, Ex. 8). Chase rated Plaintiff's performance from October 1, 2001, to September 30, 2002, as "successful."[6] (ECF No. 8-10; ECF No. 14-33, Ex. 29). On September 19, 2002, however, Chase questioned Plaintiff's use of leave, and reminded him, "[i]f you continue with the alternate leave schedule I will have to scrutinize your leave usage more closely." (ECF No. 8-9).

In 2003, Michael P. Stebbing became Plaintiff's supervisor. (*See* ECF No. 8-1, at 6). Stebbing rated Plaintiff's performance

---

[5] Chase found Plaintiff's technical competence, cooperation, communications, and management of time and resources skills inadequate. (ECF No. 8-7 ¶ 4).

[6] To earn a score of "successful," an employee had to obtain a score between fifty and sixty-nine points. Plaintiff scored fifty-nine points. (ECF No. 8-10).

from January 21, 2003, to September 30, 2003, as "successful,"[7] (ECF No. 8-11; ECF No. 14-34, Ex. 30), and gave him a rating of "excellence" for his performance from February 8, 2004, to June 30, 2004.[8] (ECF No. 8-13; ECF No. 14-35, Ex. 31).

Plaintiff's duties changed in July 2004. Prior to that time, Plaintiff was solely responsible for managing the industrial hygiene programs at ARL and BPRF. (ECF No. 8-13). In July 2004, however, Plaintiff's duties increased and he began to work under the supervision of the Director of Emergency Services. (ECF No. 8-14). Plaintiff received a performance plan on August 10, 2004, that detailed six objectives for July 1, 2004 to June 30, 2005. (ECF No. 8-14; ECF No. 14-10, Ex. 6). In addition to serving as the industrial hygienist at ARL and BPRF, Plaintiff also worked on "force protection" issues, such as developing policies and procedures to deal with emergencies caused by potential terrorist attacks. (ECF No. 8-14; ECF No. 14-10, Ex. 6).

On July 12, 2004, Stebbing placed Plaintiff on leave restriction. (ECF No. 8-12 ¶ 2). Stebbing informed Plaintiff

---

[7] Plaintiff earned fifty-four points. (ECF No. 8-11; ECF No. 14-34, Ex. 30).

[8] Plaintiff was commended for meeting "75% or more" of his performance objectives. (ECF No. 8-13, at 2).

that he had "not been dependable" and that his "excessive and irregular absences have had an adverse impact to the organization."[9] (*Id.* ¶ 1). Stebbing then required Plaintiff to obtain prior approval before taking leave and to notify him by email before leaving for and after returning from lunch. (*Id.* ¶¶ 2-3).

According to Plaintiff, he attempted to detoxify himself from January to June 2005. (ECF No. 8-3, at 8). During this period, he suffered from depression and had trouble getting out of bed. (*Id.* at 8-9). Plaintiff alleges in his complaint that he informed Stebbing in January that he "began receiving medical treatment for his alcoholism from the Agency's physician, Dr. Doina Zuba," and of his attempt to "detoxify himself." (ECF No. 1 ¶ 12). He offered contradictory testimony during a fact-finding investigation, however, stating that "[d]uring my times that I called in sick I explained to Mr. Stebbing not that I had alcoholism, but that I was going through the depression." (ECF No 8-3, at 10). Plaintiff believes that his alcoholism began to affect his work performance in February 2005. (ECF No. 8-3, at 11).

_____

[9] In particular, Stebbing admonished Plaintiff for taking "lunches that are longer than half an hour, and consistently in the one to two hour range." (ECF No. 8-12 ¶ 3).

By February 2005, Plaintiff had stopped working on force protection issues and resumed working exclusively as the industrial hygienist at ARL and BPRF. (ECF No. 8-3, at 188-89). Stebbing issued Plaintiff a performance plan containing fourteen detailed objectives relating to his role as the industrial hygienist. (ECF No. 8-15; ECF No. 14-11, Ex. 7).

On April 15, 2005, Stebbing again placed Plaintiff on leave restriction. (*See* ECF No. 8-16). Among the reasons cited for Stebbing's decision were Plaintiff's exhaustion of sick and annual leave, poor time management skills, and taking excessively long lunch breaks outside of normal lunch hours.[10] (*Id.* ¶ 3). Stebbing required Plaintiff to seek prior approval before taking leave and to present certification from appropriate medical practitioners upon his return. (*Id.* ¶ 4). In addition, Plaintiff was to notify Stebbing whenever he left his office for more than twenty-minute periods. (*Id.* ¶ 5). Plaintiff was again advised that the ARL Wellness Center was available to provide assistance. (*Id.* ¶ 6). On April 26, 2005,

---

[10] Specifically, "[a]pproximately three fifths of [Plaintiff's] time was charged Leave Without Pay (LWOP) as [he] had exhausted all [his] sick and annual leave. A review of [his] leave records for 12 out of the 16 pay periods from 1 Jul 2004 through 28 Feb 2005 (not including mid-Dec 2004 through Jan 2005), reveals that [he has] taken unscheduled leave 60 percent of the time." (ECF No. 8-16 ¶ 3a).

Stebbing emailed Plaintiff, informing him that he was not performing well, that he must follow the leave restriction requirements, and that he failed to complete his performance objectives for March 2005. (ECF No. 8-17).

On May 19, 2005, Stebbing wrote Plaintiff a memorandum detailing his poor performance, which included failing to complete reports in a timely manner, submitting incomplete reports, failing to conduct requisite samples, and failing to submit attendance and absence records. (ECF No. 8-18 ¶¶ 1-3). Stebbing cautioned Plaintiff, "[w]ithout a substantial change in your work performance, you will likely be placed in a [PIP] after this rating period ends" on June 30, 2005, and concluded, "[this memorandum] serves to document that your overall performance to date continues to be unsuccessful." (*Id.* ¶ 4).

Plaintiff's performance did not improve, and on June 24, 2005, he received a written reprimand from Stebbing for his "continued frequent and unscheduled leave . . . and insubordination." (ECF No. 8-19 ¶ 2; ECF No. 14-16, Ex. 12). Stebbing again advised Plaintiff that the ARL Wellness Center was available to assist him and warned him that any deviation from leave procedures "may result in further disciplinary action such as suspension from Federal Service." (ECF No. 8-10 ¶¶ 9-10). According to Plaintiff, he was ill on June 14, 2005, on

June 28, 2005, and on July 19, 2005, but it is unclear whether Stebbing was aware of his illness. (*See* ECF No. 14, Exs. 48, 50, 51). At Plaintiff's behest, Dr. Doina Zuba, a doctor at ARL who worked with Plaintiff but was not his treating physician, wrote an email to Stebbing on July 29, 2005, in which she discussed Plaintiff's health:

> He is still not out of all the consequences of his addiction, but miraculously his lab results are better, and he claims he feels much better. He asked me on [Tuesday] to email you something regarding his absences due to many appointments he had with the doctors, and not being able to get every time a note for you.

(ECF No. 8-28; ECF No. 14-26, Ex. 22).

In September 2005, Plaintiff was moved from a three-window office to a cubicle that he shared with a secretary. (*See* ECF No. 14-8, at 4). From January 2 to January 20, 2006, Plaintiff was hospitalized for alcohol-related illnesses. (ECF Nos. 8-1, at 9; ECF No. 14-57, Ex. 52). Stebbing attempted to determine the cause of Plaintiff's illness by contacting his wife, but she refused to disclose his alcoholism. (ECF No. 8-3, at 23-24). On February 2, 2006, Plaintiff applied to become a leave recipient. (ECF No. 14-44, Ex. 40).

On February 15, 2006, Stebbing notified Plaintiff of his unacceptable performance and placed him on PIP. (ECF No. 8-20; ECF No. 14-13, Ex. 9). According to Stebbing, Plaintiff failed

to submit 40% his reports timely, failed to develop comprehensive industrial hygiene implementation plans for ARL and BPRF, failed to document industrial hygiene health hazard assessments, and used uncalibrated equipment to measure samples. (ECF No. 8-20, at 1-5). Plaintiff subsequently underwent multiple, unsuccessful PIP counseling sessions from February 15, 2006 to May 12, 2006. (*See* ECF Nos. 8-21, 8-22, 8-23).

On June 13, 2006, Plaintiff first contacted the EEOC. (*See* ECF No. 8-1, at 12; ECF No. 14-8, at 4). On July 26, 2006, Plaintiff received a notice of right to file a formal complaint. (*See* ECF No. 8-29, at 3). Plaintiff filed a formal EEOC complaint on August 9, 2006, alleging disability discrimination. (ECF No. 8-29; ECF No. 14). The EEOC accepted the claim for investigation on August 17, 2006. (ECF No. 14, at 26). Plaintiff alleged that he was harassed by Stebbing because: (1) he had not received a rating or performance plan for that year; (2) he did not receive a performance plan for February through June 2006; (3) he did not receive a performance plan for fiscal year 2004 until February 2005; (4) he was placed on leave restriction during March or April 2005; (5) he received a written reprimand for not following leave restriction procedures in May 2005; and (6) he was moved to a smaller office in September 2005. (*Id.*)

When Stebbing retired in 2006, Joseph F. Watson, his successor, became Plaintiff's supervisor. On August 30, 2006, Watson drafted a notice of Plaintiff's proposed removal from federal service for "failure to perform at an acceptable level of competence." (ECF No. 8-26; ECF No. 14-23, Ex. 19). In particular, Watson cited Plaintiff's failure to submit industrial hygiene reports on time, failure to complete requisite chemical sampling, failure to develop a respiratory protection program, failure to develop a standard operating procedure for laboratory hood testing, and refusal to use the health hazard information module. (*Id.*) The next day, Plaintiff amended his EEOC complaint to include a claim of retaliation against Watson, which the EEOC accepted for investigation on September 6, 2006. (ECF No. 14-31, Ex. 27).

On October 26, 2006, Plaintiff was terminated for "failure to perform at an acceptable level of competence." (ECF No. 8-27; ECF No. 14-24, Ex. 20). An administrative fact-finding conference took place on March 22, 2007, during which Plaintiff admitted he did not inform Stebbing that he was an alcoholic, and Watson maintained he was unaware that Plaintiff suffered from alcoholism. (*See* ECF No. 8-1, at 11-12; ECF No. 8-3, at 80; ECF No. 14, Exs. 43-46). Stebbing testified that he had a suspicion that Plaintiff had an alcohol problem in the spring

11

of 2005 but that Plaintiff never admitted he had an alcohol problem, nor did he request any accommodations. (ECF No. 8-3, at 167, 173-74).

Plaintiff subsequently appealed his removal to the Merit Systems Protection Board ("MSPB"), and on April 4, 2007, the parties settled their differences with a negotiated settlement agreement. The agreement replaced Plaintiff's removal for unacceptable performance with a resignation for medical reasons, made effective October 26, 2006, the day Plaintiff had been removed. (ECF No. 8-30). Under the terms of the settlement agreement, Plaintiff would be eligible for disability retirement benefits. (*Id.* ¶ 2). In exchange, Plaintiff would withdraw "his appeal to the Merit Systems Protection Board and any other outstanding administrative complaint or appeal relating to his removal from Federal service." (*Id.* ¶ 3A). In addition, the settlement agreement provided that Plaintiff "shall not litigate or relitigate in any forum, judicial or administrative, any claims arising from his removal or resignation." (*Id.*)

Plaintiff did not withdraw his EEOC claim, and the EEOC issued an opinion on October 21, 2009, dismissing Plaintiff's complaint. (ECF No. 8-31). The administrative law judge ("ALJ") determined that Plaintiff's allegations regarding his removal were barred by the terms of the MSPB settlement

12

agreement and that his claims regarding leave restrictions, the move to a smaller office, and the written reprimand were untimely. Furthermore, the ALJ held that even if Plaintiff's claims were timely and not barred by the MSPB settlement agreement, he failed to establish that he was a person with a disability. (ECF No. 8-31, at 10-11).

On April 2, 2010, Plaintiff commenced the present action, alleging disability discrimination, failure to accommodate, retaliation, and hostile work environment under the Rehabilitation Act and Title VII.[11]  In particular, Plaintiff complains of discrimination arising from his removal from federal service, being placed on leave restriction on April 15, 2005, being issued a written reprimand in May 2005, not receiving a performance plan until February 2005, being moved to a smaller office in September 2005, and being placed on PIP in February 2006. (ECF No. 1 ¶¶ 16-20).

On October 8, 2010, Defendant moved to dismiss, or in the alternative, for summary judgment. (ECF No. 8).  Both parties have also filed motions to seal the complaint, Defendant's

---

[11] Plaintiff voluntarily agreed to withdraw the Title VII claims in his opposition to the motion for summary judgment. (ECF No. 14, at 28).  The court accordingly dismisses portions of count I that relate to discrimination under Title VII and count III to the extent it alleged retaliation under Title VII. (*See* ECF No. 1 ¶¶ 50-59).

motion to dismiss, Plaintiff's opposition brief, and Defendant's reply. (ECF Nos. 15, 20).

## II. Motion to Dismiss, or Alternatively, for Summary Judgment

Defendant seeks dismissal on three grounds. First, Defendant argues that the MSPB negotiated settlement agreement bars the present action. Second, Defendant maintains that Plaintiff failed to exhaust his administrative remedies because he did not make timely contact with the EEOC. Lastly, Defendant contends that Plaintiff has failed to establish prima facie cases of failure to accommodate, discrimination, and hostile work environment. Plaintiff disagrees.

### A. Standard of Review

Defendant has moved to dismiss or, in the alternative, for summary judgment. A court considers only the pleadings when deciding a Rule 12(b)(6) motion to dismiss. Because Defendant's motion relies extensively on matters outside the pleadings, the court will construe it as a one for summary judgment. *See* Fed.R.Civ.P. 12(b); *see also Walker v. True*, 399 F.3d 315, 319 n.2 (4th Cir. 2005); *Offen v. Brenner,* 553 F.Supp.2d 565, 568 (D.Md. 2008), *aff'd by*, 334 F.App'x 578 (4th Cir. 2009).

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P.

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson,* 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

## B. MSPS Negotiated Settlement Agreement

Defendant argues that by entering into a negotiated settlement agreement before the MSPB, Plaintiff is now barred from bringing the present action. Plaintiff does not challenge Defendant's argument but characterizes the settlement agreement as having "resolved the appeal of his removal." (ECF No. 14, at 4).

Title 29 C.F.R. § 1614.504(a) provides: "Any settlement agreement knowingly and voluntarily agreed to by the parties, reached at any stage of the complaint process, shall be binding on both parties." Federal courts have held that settlement agreements are contracts between the parties, subject to rules of contract interpretation. *See Campbell v. Geren*, 353 F. App'x 879, 882 (4th Cir. 2009)(unpublished opinion)(applying Virginia contract law to interpret the terms of an MSPB settlement agreement); *Harris v. Brownless*, 477 F.3d 1043, 1047 (8th Cir. 2007)("Settlement agreements, including those entered into by the government, are viewed in light of governing contract principles"); *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1266 (10th Cir. 2007)(treating a negotiated settlement agreement as a contract subject to the rules of contract interpretation). Neither party has addressed whether federal or state rules of contract interpretation should be applied here, but it makes no

16

practical difference when both federal and state contract law apply the objective theory of contracts. *See Harris*, 477 F.3d at 1047 n.2 (declining to determine whether federal or state law governed a negotiated settlement agreement because contract principles would be the same under state and federal law); *Sheng v. Starkey Labs., Inc.*, 117 F.3d 1081, 1083 n.1 (8th Cir. 1997)(recognizing that courts disagree whether federal common law or state law governs the interpretation of negotiated settlement agreement). Here both Maryland and federal law apply the objective theory of contracts. *See Taylor v. NationsBank, N.A.*, 365 Md. 166, 178 (2001); *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed.Cir. 1997).

Under the objective theory of contract interpretation, unambiguous contract terms are given their plain meaning, regardless of the parties' intentions at the time the contract was formed. *See Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 448 (2008). The interpretation of a written contract is ordinarily a question of law for the court. *Suburban Hosp. v. Dwiggins,* 324 Md. 294, 306 (1991). Therefore, when interpreting a contract, the court's task is to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Calomiris v. Woods*, 353 Md. 425, 436

(quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261 (1985)). "The true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* In its interpretation, the court must look to the entire language of the agreement, not merely a portion thereof, *Jones v. Hubbard,* 356 Md. 513, 534-35 (1999), but parol evidence of the parties' intent or meaning should not be considered unless there is an ambiguity. *Beale v. Am. Nat'l Lawyers Ins. Reciprocal*, 379 Md. 643, 660 (2004); *Bushey v. N. Assurance*, 362 Md. 626, 632 (2001); *see also Higgins v. Barnes*, 310 Md. 532, 537 (1987)("evidence is inadmissible to vary, alter, or contradict a contract that is complete and unambiguous.").

Under the terms of the settlement agreement, Plaintiff "voluntarily withd[rew] his appeal to the Merit System Protection Board." (ECF No. 8-30 ¶ 3A). Plaintiff, thus, unambiguously waived his right to appeal before the MSPB. Plaintiff also agreed to withdraw "any other outstanding administrative complaint or appeal relating to his removal from Federal service." (*Id.*) Defendant maintains that this provision was "a clear reference to the EEOC complaint on which this entire action is based." (ECF No. 8-1, at 15). The court

does not find this provision ambiguous, although it could have been more clearly written to require Plaintiff to withdraw his EEO complaint. *See Campbell*, 353 F. App'x at 881-82 (containing an MSPB negotiated settlement agreement specifically requiring a plaintiff "to waive all . . . [EEO] rights related to the relevant issues of MSPB Appeal"). This provision clearly requires Plaintiff to abandon any administrative claims relating to his removal, which includes his then outstanding EEO complaint. The actions waived are the allegations of harassment and/or retaliation when Plaintiff did not receive performance plans, that he was placed on PIP and leave restriction, and that he was issued a written reprimand in May 2005. All of these actions relate to Plaintiff's removal and are specifically cited in his notice of removal; thus, they can each be classified as an "other outstanding administrative complaint or appeal relating to his removal."

If there was any doubt that this court was barred from hearing these claims, the MSPB settlement agreement also included a provision stating that Plaintiff "shall not litigate or relitigate in any forum, judicial or administrative, any claims arising from his removal or resignation." (ECF No. 30 ¶ 3A). Plaintiff's claims regarding his removal, therefore, are indisputably barred.

19

On the contrary, however, Plaintiff's failure to accommodate, and his other discrimination and hostile work environment claims are not barred. These claims were not specifically raised in Plaintiff's EEOC complaint as relating to his discharge from federal employment. Furthermore, the portion of the settlement agreement barring litigation "in any forum, judicial or administrative, any claims arising from his removal or resignation" does not apply because these claims predate Plaintiff's removal, and thus, cannot be characterized as "arising" from his termination. (ECF No. 8-30 ¶ 3A). Plaintiff's claims for failure to accommodate, discrimination, and hostile work environment are therefore not barred by the settlement agreement, and the court will discuss each in turn.

### C. Discrimination and Hostile Work Environment Claims

Defendant argues that Plaintiff's discrimination and hostile work environment claims should be dismissed for failure to exhaust administrative remedies because Plaintiff failed to make timely contact with an EEO counselor. In the alternative, Defendant contends that even assuming *arguendo* that Plaintiff satisfied the exhaustion requirement, he fails to establish prima facie cases of discrimination and hostile work environment, and he cannot rebut the legitimate, non-discriminatory reasons set forth by Defendant.

## 1.  Failure to Exhaust Administrative Remedies

Defendant argues that Plaintiff failed to exhaust administrative remedies because he did not make timely contact with an EEOC counselor within the requisite forty-five days. (ECF No. 8-1, at 16).  Plaintiff neither admits nor denies that he failed to exhaust his administrative remedies.  (*See* ECF No. 14, at 10-12).  Rather, Plaintiff urges the court to overlook the exhaustion requirement for three reasons:  (1) because exhaustion requirements are "subject to waiver, estoppel, and equitable tolling," (2) because Defendant has suffered no prejudice from the delay, and (3) because the Army's EEOC accepted Plaintiff's claims for investigation. (ECF No. 14, at 10-11).

The Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, governs disability discrimination in federal employment. Rehabilitation Act claims are subject to the exhaustion requirements and filing procedures applicable to Title VII claims against federal employers.  29 U.S.C. § 794a(a)(1); 29 C.F.R. § 1614.103(a).  Prior to filing a charge of discrimination with the EEOC, a federal civilian employee has forty-five days to initiate contact with an EEOC counselor after the occurrence of an employment action or matter that he

believes to be discriminatory. 29 C.F.R. § 1615.105(a)(1)

states that federal employees

> who believe they have been discriminated
> against on the basis of . . . disability
> . . . must consult with a Counselor prior to
> filing a complaint in order to try to
> informally resolve the matter . . . within
> 45 days of the date of the matter alleged to
> be discriminatory, or in the case of
> personnel action, within 45 days of the
> effective date of the action.

The forty-five day time limit may be extended, however, if the

plaintiff

> shows that he or she was not notified of the
> time limits and was not otherwise aware of
> them, that he or she did not know and
> reasonably should not have been known that
> the discriminatory matter or personnel
> action occurred, that despite due diligence
> he or she was prevented by circumstances
> beyond his or her control from contacting
> the counselor within the time limits, or for
> other reasons considered sufficient by the
> agency or the Commission.

29 C.F.R. § 1614.105(a)(2). If the matter is not resolved, the

complainant may then file an EEOC charge. 29 C.F.R.

§ 1614.105(d). The scope of the employee's right to file a

federal lawsuit is determined by the contents of the EEOC

charge. *Jones v. Calvert Grp. Ltd.*, 551 F.3d 297, 300 (4th Cir.

2009). The initial inquiry under any Rehabilitation Act claim

must be to ensure that all administrative prerequisites have

been fulfilled, before considering the merits of the claim.

22

Plaintiff first contacted an EEOC counselor on June 13, 2006. (ECF No. 14-6, Ex. 2). The actions now challenged by Plaintiff were also alleged in his EEOC complaint filed on August 9, 2006. (*See* ECF No. 14-7, Ex. 3). Specifically, Plaintiff alleges that the following actions were discriminatory: being reassigned in July 2004, being placed on leave restriction in April 2005, being reprimanded a month later, being moved to a smaller office in September 2005, being placed on PIP in February 2006, and being removed from federal service in October 2006. (ECF No. 1 ¶¶ 16, 20, 23). All of these claims, aside from his removal,[12] are time-barred because Plaintiff did not contact an EEOC counselor until June 2006, well after the forty-five day deadline had passed.

Although Plaintiff urges the court to overlook the exhaustion requirement for equitable reasons, he offers no explanation as to why it would be fair or just to do so. While the deadline provision is subject to waiver, estoppel, and equitable tolling, before the doctrine will be applied, the plaintiff must prove that the defendant engaged in affirmative misconduct intended to mislead or deceive him into missing the deadline. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89,

---

[12] As discussed *supra* 19-20, the settlement agreement bars Plaintiff from now challenging his removal.

96 (1990)(also noting that "[f]ederal courts have typically extended equitable relief only sparingly" and "have generally been much less forgiving in receiving late filings when the claimant failed to exercise due diligence in preserving his legal rights."). Alternatively, Plaintiff could have argued that he had not been notified of the time limit or was not aware of them, that he did not know that discriminatory action had occurred, or that circumstances beyond his control prevented him from contacting the counselor within the time limit. *See* 29 C.F.R. § 1614.105(a)(2). He did not, and in the absence of such showing, Plaintiff is not entitled to equitable relief.

Furthermore, Plaintiff argues that because the Army's EEOC accepted late claims for investigation, this court, too, should excuse his untimeliness. (ECF No. 14, at 11-12). The EEOC's acceptance of a tardy complaint does not bind this court. Moreover, "a federal agency does not waive its right to object to untimely filings merely by accepting a complaint for investigation." *Blount v. Shalala*, 32 F.Supp.2d 339, 341 (D.Md.), *aff'd by*, 199 F.3d 1326 (4th Cir. 1999). Plaintiff's waiver argument, therefore, is meritless. And as discussed below, even if Plaintiff had satisfied the exhaustion requirements, his discrimination and hostile work environment claims fail on the merits.

## 2. Discrimination

Plaintiff asserts that Defendant discriminated against him because he is an alcoholic. To establish discrimination under the Rehabilitation Act, Plaintiff must demonstrate that he: (1) has a disability; (2) is otherwise qualified for the job in question; and (3) suffered an adverse employment action solely because of his disability. *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995). The Supreme Court has stated that "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979). Adverse employment actions are not limited to ultimate employment decisions, but rather encompasses any discriminatory act or harassment that alters the terms, conditions, or benefits of employment. *Von Gunten v. Md.*, 243 F.3d 858, 864 (4th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006). An employer may terminate an employee for poor performance, even if the unsatisfactory performance or behavior is related to the employee's alcoholism. *Little v. FBI*, 1 F.3d 255, 258-59 (4th Cir. 1993).

Plaintiff argues that he is disabled either because he suffers from an actual impairment, or because he was regarded as

25

disabled. (ECF No. 14, at 13-17). Because Defendant concedes for the purpose of this motion that alcoholism is a disability, the court will assume without deciding that Plaintiff's alcoholism constitutes a disability within the meaning of the Rehabilitation Act. In addition, because Plaintiff and Defendant do not dispute whether Plaintiff is an "otherwise qualified" individual, the court will also assume that Plaintiff is "otherwise qualified."

Defendant argues that apart from Plaintiff's removal, which is barred from litigation by the MSPB settlement agreement, Plaintiff suffered no adverse employment action. Plaintiff disagrees and maintains that he suffered adverse actions when Defendant did not "issue a 2005 performance appraisal, mid-year reviews, removed him from a three window office to a shared cubicle, placed him on leave restriction, placed him on AWOL, issued him an unjustified PIP, issued him a proposed termination and terminated him." (ECF No. 14, at 17). Plaintiff cites no precedent to support his contention that these actions, aside from his actual termination, in any way negatively affected the terms or conditions of his employment. On the contrary, case law supports Defendant's position that these incidents do not constitute adverse action. *See Toulan v. DAP Prods., Inc.*, CCB-05-2254, 2007 WL 172522, at *4 (D.Md. Jan. 17, 2007) (not having

a work station, being issued an "Attendance Warning," and being placed on PIP are not adverse employment actions); *Amirmokri v. Abraham*, 437 F.Supp.2d 414, 423 (D.Md. 2006) (a formal letter of reprimand is not generally an adverse employment action); *Newman v. Giant Food Inc.*, 187 F.Supp.2d 524, 528-29 (D.Md. 2002) (a verbal warning or counseling letter for tardy arrival to work does not constitute an adverse employment action unless it automatically affects the terms and conditions of employment).

Furthermore, Defendant argues that even if these actions were adverse, they were not undertaken "solely" on the basis of Plaintiff's disability because Plaintiff's supervisors were unaware that he suffered from alcoholism. (ECF No. 8-1, at 28). In fact, Plaintiff himself repeatedly concedes that he never informed his supervisors of his alcoholism. (*See* ECF No. 14-47, Ex. 43A, at 23-25, 39, 79). Thus, Defendant could not have undertaken adverse employment actions against him on the basis of his disability, much less "solely" on that basis. Plaintiff thus fails to establish a prima facie case of discrimination and the court will grant summary judgment for Defendant as to the Rehabilitation Act discrimination claim.

### 3. Hostile Work Environment

Plaintiff argues that his work environment was abusive and asserts that Defendant engaged in severe and pervasive

27

harassment by placing him on PIP; calling him while he was hospitalized; imposing special leave instructions; moving him to a smaller office; and refusing to provide him with a performance plan from 2004 to 2006, annual performance review, or a mid-year review. Defendant maintains that Plaintiff is merely alleging a series of discrete personnel actions, which cannot be the basis of a hostile work environment claim. In the alternative, Defendant argues that Plaintiff was not subjected to severe and pervasive harassment.

To prove a hostile work environment claim, Plaintiff must prove: (1) he is a qualified individual with a disability; (2) he was subjected to unwelcomed harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter the terms, conditions, or privileges of employment, and (5) some factual basis exists to impute liability for the harassment to the employer. *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001). The "standard for proving an abusive work environment is intended to be a very high one because the standard is designed to filter out complaints attacking 'the ordinary tribulations of the workplace.'" *Wang v. Metro. Life Ins. Co.,* 334 F.Supp.2d 853, 864 (D.Md. 2004) (citing *Mackey v. Shalala,* 360 F.3d 463, 468 (4th Cir. 2004)). The plaintiff must show that he not only

subjectively believed his workplace environment was hostile, but also that a reasonable person could perceive it to be objectively hostile. *Fox*, 247 F.3d at 178. To determine whether a reasonable person would perceive workplace conduct to be severe and pervasive, the court considers a number of factors, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Id.* at 178. The conduct at issue must be far more severe than that of "a merely unpleasant working environment," *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir.), *cert. denied*, 519 U.S. 818 (1996), and must be sufficiently "pervasive [so] as to become diffuse throughout every part of the . . . work environment in which plaintiff functioned." *Schweitzer-Reschke v. Avnet, Inc.*, 874 F.Supp. 1187, 1195 (D.Kan. 1995).

The incidents cited by Plaintiff do not constitute harassment. The record reflects no instance where Plaintiff's supervisors could be characterized as having threatened or humiliated him. In addition, Plaintiff cites no situation where his supervisors made any offensive utterances regarding his alleged disability. For harassment to be sufficiently severe or pervasive, the work place must be "permeated with discriminatory

intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Discrete and isolated personnel decisions, such as the ones cited by Plaintiff, simply do not rise to the level of a hostile work environment. *Pueschel v. Peters*, 577 F.3d 558, 566 (4th Cir. 2009); *Lewis v. D.C.*, 653 F.Supp.2d 64, 80 (D.D.C. 2009) (explaining that in hostile work environment claims, it is important to "exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals."). Because Plaintiff has failed to show that he suffered from severe and pervasive harassment, summary judgment for Defendant will be granted on the hostile work environment claim.

**D.   Failure to Accommodate**

Defendant urges the court to dismiss Plaintiff's failure to accommodate claim for failure to exhaust. In the alternative, Defendant argues that Plaintiff fails to state a prima facie case.

**1.   Exhaustion of Administrative Remedies**

The scope of a plaintiff's right to file a federal lawsuit is determined by the contents of his EEOC charge. *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). "Only those discrimination claims stated in the initial charge, those

reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained" in a subsequent lawsuit. *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 963 (4th Cir. 1996). Thus, a claim will generally be barred if the EEOC charge alleges discrimination on one basis, such as disability, and the formal litigation claim alleges discrimination on a separate basis. *See Talbot v. United States Foodservice, Inc.*, 191 F.Supp.2d 637, 640-41 (D.Md. 2002) (granting summary judgment against an employee who alleged race discrimination in his EEOC charge but brought suit under both Title VII and the ADA). Generally, "[c]ivil suits may not present entirely new factual bases or entirely new theories of liability not found in the initial EEOC complaint." *Thorn v. Sebelius*, --- F.Supp.2d ---, DKC 10-0299, 2011 WL 344127, at *8 (D.Md. Feb. 1, 2011) (rejecting the plaintiff's attempt to "transform what was once a retaliation claim into a race-based discrimination claim").

Plaintiff did not explicitly raise a failure to accommodate claim before the EEOC. Plaintiff's EEOC counselor noted in a report that "Steve Rock claims he does need any special accommodations, but wants to stay in the RDO program to be able to have time to [*sic*] doctor's appointments." (ECF No. 14-6, Ex. 2, at 2). The list of claims investigated by the EEOC also

31

did not include a failure to accommodate claim. (*See* ECF No. 14-8, Ex. 4). The transcript of the fact investigation conducted by the EEOC, however, reveals significant discussions regarding reasonable accommodations. (*See* ECF No. 14-47, Ex. 43A, at 10 (investigator questioning Plaintiff as to whether he requested any accommodations); ECF No. 14-48, Ex. 43B, at 150-52 (discussing accommodations requested by Plaintiff and Defendant's response); ECF No. 14-49, Ex. 44, at 113-18 (testimony of Doina Zuba as to whether Plaintiff requested accommodations)). In addition, the EEOC report following the Investigation discusses the fact that Plaintiff did not request accommodations. (See ECF No. 14-8, Ex. 4, at 5, 7). The court will therefore treat the reasonable accommodation claim as having been properly exhausted.

### 2. Substantive Claim

To establish a prima facie case for failure to accommodate, Plaintiff must show: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the employer refused to make such accommodations." *Rhoads v. FDIC,* 257 F.3d 373, 387 n.11 (4th Cir. 2001)*, cert. denied*, 535 U.S. 933 (2002).

The burden to provide notice of a disability is "not a great one . . . . Adequate notice simply informs the employer of both the disability and the employee's need for the accommodations for that disability." *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 369 n.5 (4th Cir.), *cert. denied*, 129 S.Ct. 343 (2008); *see Schneider v. Giant of Md., LLC*, 389 F.App'x 263, 270 (4th Cir. 2010) (holding that an employer's knowledge that an employee was diabetic did not equate to notice that the employee's diabetes was so limiting as to be disabling and to require special accommodations); *Huppenbauer v. May Dep't Stores Co.*, 99 F.3d 1130, 1996 WL 607087, at *4 (4th Cir. 1996) (unpublished table opinion) (holding that if all of an employee's coworkers knew that he had a heart condition, such knowledge would not amount to notice to the employer that the employee was so limited by a disability as to require special accommodations). Thus, "[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." *Huppenbauer,* 1996 WL 607087, at *6 (quoting *Movisky v. Broward Cnty.*, 80 F.3d 445, 448 (11th Cir. 1996)).

Defendant concedes for the purposes of this motion that alcoholism is a disability and the court will assume without

deciding that Plaintiff can satisfy his burden of proof.[13]
Defendant, however, contends that Plaintiff failed to prove that
Defendant had notice of Plaintiff's disability and failed to
show that he was denied any reasonable accommodation. Plaintiff
counters that his supervisors knew he was suffering from
alcoholism and argues that he did request accommodations.

The record does not support Plaintiff's claims.
Plaintiff's supervisors repeatedly deny having definite
knowledge of Plaintiff's alcoholism, and Plaintiff admits that
he never informed them that he was suffering from alcoholism.
In fact, Plaintiff stated that when he was hospitalized in
January 2006, "My wife told me that Mr. Stebbing was calling all
the time wanting to know what my medical condition was. She

---

[13] A disability is: "(A) a physical or mental impairment
that substantially limits one or more of the major life
activities of such individual; (B) a record of such an
impairment; or (C) being regarded as having such an impairment."
42 U.S.C. § 12102(2). The Fourth Circuit has recognized
alcoholism as a handicapping condition within the meaning of the
Rehabilitation Act. *Little v. FBI*, 1 F.3d 255, 257 (4th Cir.
1993); *Rodgers v. Lehman*, 869 F.2d 253, 258 (4th Cir. 1989). To
be a qualified individual with a disability, however, Plaintiff
must be "able to meet all of a program's requirements in spite
of his handicap." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406
(1979). In *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d
209, 213 (4th Cir. 1994), the Fourth Circuit held that employees
who cannot meet the attendance requirements of a job cannot be
considered "qualified" individuals and explained that "[i]n
addition to possessing the skills necessary to perform the job
in question, an employee must be willing and able to demonstrate
these skills by coming to work on a regular basis."

said I cannot tell you what his medical condition is."
(ECF No. 14-47, Ex. 43A, at 23-24). When Plaintiff was again
hospitalized in early March 2006, Plaintiff recalled that
Stebbing "actually called my hospital room. They would let the
number through. He was talking to me on the line about work
while I was in bed at work [sic] and I told him I did not want
to talk to him." (ECF No. 14-47, Ex. 43A, at 24-25). Plaintiff
repeatedly acknowledged he never informed his supervisors that
he suffered from alcoholism. In fact, Plaintiff told Stebbing
that he suffered from depression. (ECF No. 14-47, Ex. 43A,
at 39). Plaintiff also disclosed: "I was depressed throughout
this thing. I did not refer to alcoholism. I didn't want to.
I was referring to it as – as depression . . ."[14] (ECF No. 14-
47, Ex. 43A, at 79).

---

[14] INVESTIGATOR: When do you believe your
chain of command became aware of your
disabling condition?

[PLAINTIFF]: Okay. I have a question. What
does – does the disabling condition refer to
alcoholism or depression?

INVESTIGATOR: Well, since you kind of go
back and forth with –

[PLAINTIFF]: I only tell them about
depression.

(ECF No. 8-3, at 80).

According to Plaintiff, he confided his medical problems to Dr. Zuba, an occupational health physician at ARL. (ECF No. 14-47, Ex. 43A, at 29-30).[15] Dr. Zuba admitted to writing an email informing Stebbing that she "noticed his health improvements" and that Plaintiff was "still not out of all the consequences of his addiction, but miraculously his lab results are better, and he claims he feels much better." (ECF No. 14-26, Ex. 22). Aside from mentioning vaguely "an addiction," however, the email did not clarify what addiction Plaintiff suffered from. (*Id.*). Dr. Zuba denied that Plaintiff ever sought accommodations from her and testified that she never informed Plaintiff's supervisors that he may need accommodations. (ECF No. 14-49, Ex. 44, at 113-17).

Stebbing knew that Plaintiff often saw doctors and was hospitalized in 2006, but did not learn that Plaintiff suffered from alcoholism until after he had been terminated. (ECF No. 14-50, Ex. 45, at 163). Stebbing admitted that he had heard from other employees in 2005 that Plaintiff may have had a drinking problem. (ECF No. 14-50, Ex. 45, at 165-67). While Stebbing acknowledged that he never asked Plaintiff to bring

---

[15] Dr. Zuba was not Plaintiff's treating physician but a co-worker in whom he confided his medical problems. (ECF No. 8-3, at 31, 82, 108, 112).

36

medical documentation regarding his condition, he instructed Plaintiff in the warning letter and reprimand letter to provide medical documentation whenever he was absent for extended periods of time. (ECF No. 14-50, Ex. 45, at 169). Stebbing admitted to receiving a few notes from Plaintiff's doctor, but they did not disclose his alcoholism. On June 28, 2005, a letter from Dr. Walcott indicated that Plaintiff was on diuretic medicine and would have to take frequent trips to the bathroom. (ECF No. 14-50, Ex. 45, at 170). And a letter dated July 19, 2005, stated that Plaintiff suffered from a chronic medical condition. (ECF No. 14-50, Ex. 45, at 170-71). Stebbing did not know whether Plaintiff had trouble working, but testified that "he had a problem showing up on time on a routine basis." (ECF No. 14-50, Ex. 45, at 172). He also disclosed that Plaintiff told him "on several occasions that he has difficulty sleeping." (*Id.*) Watson, too, denied knowledge that Plaintiff suffered from a disability. (ECF No. 14-51, Ex. 46, at 235-36).

Plaintiff's own testimony uncontrovertibly establishes that his supervisors were not notified that he was an alcoholic. At most, Stebbing and Watson had unsubstantiated suspicions that Plaintiff may have had an alcohol problem. None of the communications or doctors' notes indicated that these undisclosed conditions limited Plaintiff's ability to work to

such a disabling extent as to require accommodation. Because Plaintiff fails to establish that the Defendant was on notice of his disability, the court need not reach the question of whether he attempted to request accommodations. Accordingly, summary judgment for Defendant will be granted on the claim for failure to accommodate.

**III. Motions to Seal**

Both Plaintiff and Defendant have submitted motions to seal. A motion to seal must comply with Local Rule 105.11, which provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections. The Court will not rule upon the motion until at least 14 days after it is entered on the public docket to permit the filing of objections by interested parties. Materials that are the subject of the motion shall remain temporarily sealed pending a ruling by the Court. If the motion is denied, the party making the filing will be given an opportunity to withdraw the materials.

There is a well-established common law right to inspect and copy judicial records and documents. *See Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597 (1978). If competing interests outweigh the public's right of access, however, the court may, in its

discretion, seal those documents from the public's view. *See In re Knight Pub. Co.,* 743 F.2d 231, 235 (4th Cir. 1984).

Prior to sealing any documents, the court must provide the non-moving party with notice of the request to seal and an opportunity to object. *Id.* This notice requirement may be satisfied by either notifying the persons present in the courtroom or by docketing the motion "reasonably in advance of deciding the issue." *Id.* at 234. Finally, the court should consider less drastic alternatives to sealing, such as filing redacted versions of the documents. If the court decides that sealing is appropriate, it should also provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives. *Id.* at 235.

Plaintiff seeks to seal the complaint, Defendant's motion to dismiss or for summary judgment, Plaintiff's opposition brief, and accompanying exhibits. (ECF No. 15, at 1). Defendant seeks to seal its reply brief. (ECF No. 20). Both motions are unopposed. The basis for the requests to seal is that the documents contain sensitive medical information about Plaintiff. Plaintiff alleges that redaction is not a viable alternative to sealing because Plaintiff's counsel would need to redact the documents manually, which would consume a significant amount of time and expense. (ECF No. 19, at 1).

Although sensitive medical or personal identification information may be sealed, s*ee Pittson Co. v. United States,* 368 F.3d 385, 406 (4th Cir. 2004) (affirming decision to seal certain "confidential, proprietary, commercial, or financial data" that was produced under a protective order); *Briggs v. Marriott Int'l, Inc.,* 368 F.Supp.2d 461, 463 n. 1 (D.Md. 2005) (sealing sensitive medical records), *aff'd by*, 205 F.App'x 183 (2006), the scope of Plaintiff's request is too broad. In seeking to seal the complaint and the entirety of the summary judgment briefing and accompanying exhibits, Plaintiff effectively seeks to seal any reference to his alcoholism, the very basis for his claims under the Rehabilitation Act. Defendant recognizes this in his motion to seal, noting "Plaintiff's entire case arises under the Rehabilitation Act, which necessarily places his claimed disability at issue." (ECF No. 20-1, at 4); c*f Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992) (denying plaintiff's request to proceed anonymously where he alleged that the Postal Service fired him because he was an alcoholic in violation of the Rehabilitation Act stating "[w]e find no abuse of discretion in the district court's implicit conclusion that the stigma involved in Doe's disclosure does not rise to the level necessary to overcome the presumption of openness in judicial proceedings. . . ."). Granting Plaintiff's request wholesale

would effectively seal the entire case, and, thus, would infringe too extensively on the public right to access court records. Plaintiff filed the complaint on April 2, 2010, but did not seek to seal it for eight months. Defendant's motion was filed on October 8, 2010, again not under seal, and Plaintiff waited another two months before seeking to seal the material.

In his memorandum, Plaintiff provides a truncated list of documents he proposes sealing in the event his broader request is denied. Specifically, Plaintiff requests to have the following sealed: (1) the complaint in its entirety; (2) Defendant's Motion, Memorandum, and Exhibits 1, 26, 28 and 29; and (3) Plaintiff's Opposition, Memorandum, and Exhibits 4, 22, 24, 25, 29, 30, 40, 43A, 43B, 44, 45, 46, 48, 50, 51, 52, and 53. (ECF No. 19 ¶ 4). The complaint does reference Plaintiff's alcoholism but it does not contain detailed information regarding his medical condition, treatment, or diagnosis, and it will not be sealed, particularly because Plaintiff filed the complaint without filing a motion to seal for eight months. Likewise, Defendant's motion and accompanying memorandum and reply, along with Plaintiff's opposition and memorandum do not delve into the details of Plaintiff's condition to a degree that warrants sealing.

41

Many of the exhibits to the motions, however, do contain sensitive medical information and will be sealed. Exhibit 1 to Defendant's motion for summary judgment (ECF No. 8-3) and Exhibits 43A, 43B, 44, 45, and 46 to Plaintiff's opposition (ECF Nos. 14-47 through 14-51) are the transcripts from the EEOC investigation of Plaintiff's complaint. Exhibit 4 to Plaintiff's opposition is the EEOC investigator's report. (ECF No. 14-8). In the transcripts and investigator's report Plaintiff's medical condition and treatment are discussed in some detail. Out of an abundance of caution these exhibits will be sealed. Exhibit 26 to Defendant's memorandum and Exhibit 22 to Plaintiff's opposition are the same email from Doina Zuba to Plaintiff's supervisor referencing Plaintiff's "addiction". (ECF Nos. 8-28 and 14-26). This email does not contain sensitive medical information and will not sealed. Exhibit 28 to Defendant's motion for summary judgment is a copy of Plaintiff's MSPB settlement agreement. (ECF No. 8-30). The agreement does not even reference Plaintiff's medical condition nor does it contain personal identification information and it will not be sealed. Exhibit 29 to Defendant's motion for summary judgment is the decision of the ALJ resolving Plaintiff's EEOC complaint. (ECF No. 8-31). Defendant has redacted sensitive material such as Plaintiff's address or

42

social security number and the remainder of the document does not contain sensitive information, accordingly this document will not be sealed. Exhibits 24, 25, 29, 30, 40, 48, 50, 51, 52, and 53 to Plaintiff's opposition are medical records and employer personnel records that contain Plaintiff's personal identification information or detailed medical diagnoses. (ECF Nos. 14-28, 14-29, 14-34, 14-44, 14-53, 14-55, 14-56, 14-57, and 14-58). These documents will be sealed. Normally the parties would be permitted to withdraw those documents that the court declines to place under seal. Here, though, much of the material has already been publicly available for some time and withdrawal would amount to withdrawal of the entire case.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted. The motions to seal with granted in part and denied in part. A separate order will follow.


                                    /s/
                         _____
                         DEBORAH K. CHASANOW
                         United States District Judge